UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CR-73 |
| | ) | (PHILLIPS/SHIRLEY) |
| LAWANNA BROCK, and | ) | |
| RONDAL BROCK | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter is before the Court upon Defendants' Motion To Suppress [Doc. 40], filed on October 20, 2006. Assistant United States Attorneys Cynthia Davidson and Gregory Weddle were present representing the government. Attorneys Thomas Dillard and Wade Davies were present representing Defendant Lawanna Brock, and Attorney Daniel Warlick was present representing Defendant Rondal Brock. Both Defendants were present. At the conclusion of the hearing, the Court granted Defendants' request to have the option of filing post-hearing briefs on or before November 28, 2006, and gave the government until December 8, 2006 to file a response. The Court took the motions and related filings under advisement on December 9, 2006.

# I. POSITION OF THE PARTIES

The Court will fully address the position of the parties in its analysis section below.

# II. SUPPRESSION HEARING TESTIMONY

Testimony of Margaret Chuinard

The first witness called by the government was Margaret Chuinard ("Chuinard"). Chuinard is a Special Agent, Criminal Investigator with the Tennessee Bureau of Investigation ("TBI"). Chuinard testified that she worked in the Medicaid Fraud Control Unit ("MFCU"), which is a special division in the TBI. She indicated that the duties of the MFCU are to investigate allegations of fraud and abuse within the state's Medicaid system (TennCare).

Chuinard testified that on May 23, 2003, she went on an office review of the Tazewell Medical Clinic ("TMC"). Chuinard stated that she was not one of the first agents inside the Clinic; she did not enter the Clinic until directed to do so by the case agent, Special Agent T.J. Battle. She testified that shortly after she was called in, Special Agent Battle asked her to witness her discussion with counsel for the Brocks. Chuinard stated that the attorney for the Brocks and Special Agent Battle were in the meeting, but that the Brocks were not. Chuinard testified that SA Battle explained to the Brocks' attorney [Mr. Presnell] the purpose for the onsite review and provided him with a copy of the Governor's Executive Order 47. [Ex. A-1]. Chuinard stated that there was a brief discussion between SA Battle and Mr. Presnell before Mr. Presnell eventually said it was okay for the agents to proceed with the office review. Chuinard testified that after her meeting with Mr. Presnell, she assisted one or two other individuals with scanning patient records

in another room at the medical practice.

On cross examination, Chuinard explained that a case agent is the representative for the case and directs all of the activities, whereas an agent is there to assist the case agent. Chuinard indicated that she did not know whether SA Battle had spoken with Mr. Presnell prior to Chuinard's witnessing the meeting. She stated that she was there when SA Battle presented Executive Order 47 [Ex. A-1] to Mr. Presnell and explained it to him. She stated that it was SA Battle's responsibility to make reports of the various contacts with the clinic and with the clinic personnel. When asked what Executive Order 47 does, Chuinard explained that it defined their statutory authority to conduct office reviews and gave them the authority to be able to show up at a provider's office and request information so long as it was part of an ongoing investigation.

Chuinard testified that all TennCare providers are provided with [Ex. A-1] when the TBI-MFCU show up for a site review. She stated that she did not know whether providers were aware of [Ex. A-1] in the normal course of their business. Chuinard testified that she was at TMC sometime prior to May, 2003, with a team of investigators, for the purpose of requesting one medical record, and that most of the people she was with were directed to stay inside the vehicle and not go inside the facility; she indicated that she did not go inside the facility on that occasion.

When asked whether it was her understanding that agents from TBI-MFCU could appear at a provider's location at any time and request access to records, Chuinard testified that it should be within the regular course of an ongoing investigation. She further indicated that they did not go on "fishing expeditions" when asked whether there was such a thing as a random audit where they just went in and selected random files. Chuinard stated that she could not recall what records were requested in May, 2003 from the Tazewell Medical Clinic. She did indicate that it was "very

possible" that the records could have been of TennCare enrollees, as well as other records, depending on what was going on. Chuinard stated that generally they do not look at other records unless there is a very good reason. Chuinard agreed that she was familiar with the various provider contracts that providers like Tazewell Medical Clinic and the Brocks have with managed care companies. She further agreed that, to her knowledge, those contracts set out audit rights and responsibilities.

Chuinard testified that she could not remember how many agents participated in the May, 2003 office review, but stated that they were finished with the office review by mid-afternoon. Chuinard had no specific recollection as to whether the agents got together and decided who was going to do what prior to their visit to TMC. Chuinard agreed that the agents were armed when they entered TMC. Chuinard testified that patients were at the TMC when they showed up. When asked whether she went through the patient waiting room to get to the back office, Chuinard stated that she remembered coming in through the back way or side door. She did not know whether other agents came through the front door. Chuinard approximated that she and other agents waited at the back of TMC for 15-20 minutes before other agents let them in. She agreed that she did not know when the agents entered the front door of TMC because she was at the back door.

Chuinard testified that she had no personal knowledge of any illegal activities of the Brocks prior to May 23, 2003. She also indicated that she did not know what the specific purpose of the record request was on that date. Exhibits Nos. A, A1-10 were received in evidence. Defendants agreed to stipulate to the authenticity of the contracts [Ex. A-5, 6, 7, 9 and 10]. Specifically, Defendants agreed that the contracts were signed by Defendants and stipulated that the contracts were in place at the time of the office reviews.

Testimony of Valerie Smith

The next witness called by the government was Valerie Smith ("Smith").  Smith is employed as a staff attorney with the Tennessee Bureau of Investigation ("TBI").  Smith testified that the Medicaid Fraud Control Unit ("MFCU") is a unit within the TBI Criminal Investigation Division  that is responsible for conducting a statewide program for investigating fraud in the TennCare program and abuse of patients in Medicaid receiving facilities, codified at 42 CFR 1007.11.  Smith indicated that MFCU was formed in 1983 when Executive Order 47 transferred power to the MCFU.  She stated that TennCare is the managed care program that replaced the traditional state Medicaid program in 1994.  She further explained that the Tennessee Department of Finance and Administration, which administers the TennCare program, enters into contracts with managed care organizations ("MCO"), and in exchange for the provisions and the contract requirements of the MCOs, the MCOs then receive a prepaid monthly captiated rate.  The MCOs then enter into contracts with individual providers or subcontractors.

Next, Smith was shown [Ex. A-8], the Amended and Restated Contractor Risk Agreement Between the State of Tennessee and Volunteer State Health Plan, Inc.  She indicated that this is the contract that the state enters into with each MCO and that it sets out the duties that the state and the MCOs both have.  She explained that while this contract [Ex. A-8] is with Volunteer State Health Plan, Inc., the state enters into similar contracts with every MCO that administers TennCare.  Smith was then asked to look at [Ex. A-8, p.11] and summarize Section 1.5, entitled "Fraud and Abuse."   She indicated that the TBI-MFCU is the state agency responsible for investigating provider fraud and abuse in the state Medicaid program called TennCare and that MCOs and health care providers "shall upon request make available to the TBI-MFCU any

administrative, financial and medical records relating to the delivery of items or services for which TennCare monies are expended." She also stated it requires that the MFCU be allowed access to the place of business of any MCO or health care provider during normal business hours.

Next, Smith was asked to look at [Ex. A-8, p. 86] and summarize Section 2-18, entitled "Provider Agreements." Smith agreed that Section 2-18 is what TennCare requires the insurance companies to put in their contracts with the providers. She explained that this section provides that the TennCare Department of Health and Human Services and Office of Inspector General Comptroller have the right through inspection, whether announced or unannounced or any other means, to have access to records pertinent to the agreement, including quality, appropriateness and timeliness of services, and that the evaluation has to be performed with the cooperation of the provider. Smith stated that in this contract, the definition of TennCare specifically includes the TBI's MFCU.

On cross examination, Smith stated that, as a staff attorney, she comes into contact with the TBI agents and that she is involved in some training programs. She indicated that the training programs include the procedures that should be employed by agents when making office visits. Smith stated that she (1) provided agents with a letter from the Director of TennCare that sets forth the MFCU's authority to conduct office reviews, (2) provided agents with the CFR and state statutes, and (3) instructed agents that staff attorneys would be available, if anyone had questions. Smith stated that the agents could advise providers that they could be excluded from the program if they resisted the office review, but indicated that there was no rule that required the agent to advise the provider of the consequences.

Smith agreed that the TBI has subpoena powers and that the TBI could request state

and federal search warrants. Smith also agreed that the CFR has a permissive exclusion for failure to produce records, which is an administrative remedy. Smith was then asked to look at [Ex. A-4]. Smith indicated that she did not know whether all providers were given a copy of this letter [Ex. A-4], along with Executive Order 47 [Ex. A-1], when agents conducted office reviews. She did, however, point out that the last paragraph of the letter instructs providers to contact legal counsel for TennCare if they or their attorneys had any questions regarding the contents of this letter. When asked whether she agreed that depending on how this letter [Ex. A-4] was presented and what was said, it could certainly affect whether a provider decided to comply or not, Smith stated that she thought the letter spoke for itself. She further stated that the agents are instructed that if a provider objects to the office review, they are either to leave or to contact her or her supervisor. Smith stated that she had never been on an office review.

Smith stated that she did not believe exclusion (the penalty for noncompliance) from the program was automatic. When asked whether agents first utilize Executive Order 47 [Ex. A-1] to request records before obtaining an administrative subpoena, Smith stated that "our agents have the discretion to utilize whichever investigative tools they feel are appropriate." Smith agreed that it would not be consistent with the idea of a "request" for agents to "bust in" to a patient waiting room at a TMC, flash their badges and say they need records. She agreed that agents should quietly go into TMC so as not to disrupt business. Smith stated that she could not recall how the investigation in this case got started, but did recall that there was a complaint. Smith indicated that they look at all complaints independently and decide which investigative tools to use. She could not, however, recollect in this case which tool would have been the most appropriate.

When asked whether she gave agents any type of written guidelines for investigations

or issuing administrative subpoenas, Smith stated that she gave the agents the statutes and "a little cover sheet that says this is what is attached." When asked whether health care providers should be careful what records they give out under HIPPA, Smith stated that the MFCUs are specifically designated as health oversight agencies and are excluded from the provisions of HIPPA. She further stated that [Ex. A-4] also notifies health care providers of this. When asked whether she believed civilian health care providers could interpret the criminal statute and HIPPA regulations set forth in [Ex. A-4] in making a determination whether or not they have to hand out records, Smith noted that the letter instructs providers and their attorneys to contact legal counsel for TennCare with any questions.

Testimony of Brian Pritchard

The third witness called by the government was Brian Pritchard ("Pritchard"). Pritchard is employed with the TBI and is currently assigned to a field position with the Criminal Investigation Division. He was formerly assigned to the Medicaid Fraud Control Unit (MFCU). Pritchard testified that he went on three (3) office reviews of the Tazewell Medical TMC.

Pritchard stated that his first office review at TMC was on May 23, 2003. Pritchard indicated that he and Special Agent T.J. Battle entered the front door of TMC, went to the front desk in the lobby, presented identification, and asked to speak with Dr. Fejeran. He stated that the officer manager instructed them that Dr. Jejeran was not there and then escorted them from the lobby into another room. Pritchard stated that the Brocks were summonsed by the office manager and joined them in this room. He testified that he and SA Bttle identified themselves again, informed the Brocks that they were with the MFCU, and presented them with a copy of a letter [Ex. A-1]

authorizing them to be there to inspect records.

Pritchard indicated that the Brocks first asked them whether they could remain open while they conducted the office review, and they told them, "[b]y all means, yes." The Brocks then asked them if they could stand by momentarily while they spoke with Dr. Fejeran and contacted a local attorney, named Presnell. Pritchard stated that he did not see Mr. Presnell arrive, but that SA Chuinard and SA Battle had a meeting with him.

Pritchard testified that he was assigned to transport records from the filing area back to a small break area where they copied the records. He stated that the office manager showed him to the break area, which was located outside of patient care. Pritchard testified that TMC did not close at first, but sometime shortly before noon, Ms. Brock informed them that they were closing the practice. He stated that the Brocks also left TMC, leaving the office manager [Ms. Robinson] to assist them.

On cross examination, Pritchard stated that there were approximately five (5) agents at the office review on May 23, 2003. He testified that Special Agent Battle was the lead agent and that she was the one who made assignments as to who did what. Pritchard testified that he entered TMC with SA Battle at around eight o'clock; Mr. Presnell showed up sometime after nine; and SA Battle and Mr. Presnell met around ten. He indicated that he did not make any notes as to his activities. Pritchard stated that there were a few patients when he and SA Battle entered TMC. He stated that he was wearing a jacket and a tie and carried a sidearm, which was not visible. He indicated that he and SA Battle showed their credentials to the receptionist at the front desk; he agreed that they were within ear shot of the people in the waiting room. He stated that they then asked to speak with Dr. Fejeran. Pritchard testified that they were then escorted out of the waiting

area into another room while the office manager (Ms. Robinson) went to retrieve the Brocks. He stated that Agent Battle presented the Brocks with a copy of the Executive Order 47 and explained to them that they were there to copy some records. Pritchard testified that Agent Battle had a list of records.

Pritchard testified that Ms. Brock instructed them that she would like to speak with Dr. Fejeran and her local attorney, Mr. Presnell. He indicated that he was not privy to the conversation between SA Battle and Mr. Presnell. He stated they waited in the parking lot behind TMC for instructions from SA Battle. Pritchard could not remember the dates when the other two office reviews were conducted, but stated the purpose of the visits was to scan records. He indicated that on May 23, 2003, they brought the scanning equipment in through the back door so as not to interrupt anything in the front of the office. Pritchard estimated that they started copying the records around 10:00 a.m., but was not sure whether any records were copied before 9:00 a.m.

On redirect examination, Pritchard testified that he had participated in more than six office reviews in his career. He stated that during those office visits, some providers had asked him to leave and that he had "promptly exited" when asked.


Testimony of Barry Carrier

The last witness called by the government was Barry Carrier ("Carrier"). Carrier is a Special Agent with the TBI and is currently assigned to the Medicaid Fraud Control Unit (MFCU). Pritchard testified that he has been on two (2) different office reviews of the Tazewell Medical TMC. Carrier indicated that the first office review he participated in was on July 1, 2003. He stated that he and SA Battle made the initial entry into TMC; they introduced themselves to the

receptionist and asked to speak with the person in charge. Carrier stated that the receptionist left to retrieve someone and that they explained to that person what they were there for; he stated that they discussed using a back entrance so they didn't come in and out of the main lobby of the practice. Carrier said he then went around back and came in the back of TMC to set up the scanners.

Carrier testified that only Mr. Brock was at TMC on July 1, 2003. He stated that he did not have a lot of contact with Mr. Brock; he indicated that SA Battle was the case agent and that he was just there in a supportive role. Carrier testified that they set up the scanning equipment in a small office within TMC. He stated that sometime thereafter Mr. Brock left TMC. Carrier testified that his assignment was either putting together files or taking apart files. He indicated that there is typically a team of three people per scanner, but also noted that the number of agents involved in an office review depends on the size of the review and the number of records. He indicated that his duties in these office reviews are "almost purely" clerical.

Carrier testified that he also participated in the office review on April 21, 2004. He stated that he made the initial entry into TMC with SA Battle on this visit too. He stated that SA Battle told the receptionist that she needed to speak with whoever was in charge and that Ms. Brock came out and led them into a small room. Carrier stated that Ms. Brock told them that she had spoken with her attorney and that she did not have to talk to them or answer any questions. He said they explained to her that they were not there to question her, that they were only there for the purpose of reviewing more records and that they had a list of names of patient reports that were in question. Carrier stated that Ms. Brock was "somewhat confrontational." He stated that she told them that they could scan the records, they could see the records, but that they could not talk to her

or her staff.  Carrier testified that they agreed to those conditions because that wasn't the purpose of the visit.

Carrier testified that Ms. Brock told them that she was too busy to pull the requested records and that they would have to pull the records themselves.  He stated that they agreed to do that as long as they had somebody to guide them to where the records were located.  Carrier stated that sometime after they had begun scanning the records, he was told that an attorney had arrived at TMC.  Carrier testified that on the third office review of the Tazewell Medical Clinic, they brought the "mobile office" because of the cramped quarters in TMC.  He said the mobile office made office reviews easier for them and providers because they didn't have to take up space in the provider's facility and they could run two scanners at one time.  Carrier testified that no one told them to stop scanning the records while they were there.

On cross examination, Carrier agreed that they had a list of records that they were there to obtain.  He stated that he did not know how the list came about, but indicated that the case agent, who was SA Battle, would have been responsible for assembling the patient names/records they were there to copy.  When asked whether the patients on the list were PHP, BlueCare or John Deere enrollees, he stated that "they would have been one of the companies."  He agreed that they would have to have been a TennCare enrollee or Medicare enrollee.  Carrier testified that he was not present when Executive Order 47 was presented to either the Brocks or to the attorney on the July or April visits.

### III. ANALYSIS

Defendants' Motion To Suppress [Doc. 40] and post-hearing brief [Doc. 56][1] request the Court to suppress all testimony, evidence and statements taken or obtained as a result of illegal searches conducted by the Tennessee Bureau of Investigation at the Tazewell Medical Clinic on May 23, 2003; July 1, 2003; and April 21, 2004.

Defendants are charged in a seven (7) count Superceding Indictment [Doc. 23] with violations of 18 U.S.C. § 1518 and U.S.C. § 1347. The allegations in the indictment arose from a more than two year investigation into Defendants' business, the Tazewell Medical Clinic ("TMC"), by the Tennessee Bureau of Investigation ("TBI"), who comprised the TBI Medicaid Fraud Control Unit ("MFCU"). During their investigation, TBI agents conducted three office reviews of TMC. Ms. Brock has indicated that she is without sufficient knowledge to address the manner in which the second office review (July 1, 2003) occurred, but maintains that it was illegal for the same reasons applicable to the May 23, 2003 and April 21, 2004 office reviews [Doc. 56, fn. 1]. On May 23, 2003 and April 21, 2004, TBI agents arrived at TMC and presented a list of patient records to be scanned. Ms. Brock contends that the agents told her that she was required to permit them access to the requested records. Each office review was unannounced and conducted without a warrant, either administrative or judicial. During each of the office reviews of TMC, various documents, including patient records, were scanned.

Defendants argue that because the office reviews of Tazewell Medical Clinic were conducted without a warrant in violation of the Fourth Amendment, the searches are presumptively

---

[1] The Court granted Defendant Rondal Brock's Motion to Adopt Post-Hearing Brief On Suppression Of Seized Evidence.

unreasonable and, thus, all testimony, evidence and statements taken or obtained as a result of the illegal searches and seizures should be suppressed. Defendants further contend that the burden rests with the government to prove that an exception to the warrant requirement exists to justify the searches and that the government has failed to do so.

The government responds [Docs. 47 and 58] that the TBI-MFCU office reviews were not prohibited by the Fourth Amendment, as Defendants claim, because office reviews are contemplated by statute, by contracts, and by the Code of Federal Regulations and they have been upheld by courts. The government further argues that: (1) Defendants consented to the office reviews, (2) the records reviewed were records pertinent to TennCare, (3) Defendants' consent to the office reviews can be found in their contracts with the Manage Care Contractors ("MCC") which administer TennCare [Doc. 47, Ex. 5-7 and 9-10], and (4) no warrant was needed for the office reviews because the reviews fit squarely within the "highly regulated" warrant exception; by joining Tennessee's Medicaid Program (TennCare), which is a heavily regulated industry, Defendants agreed to open their business to regulatory review.

The Court will address two specific issues in this case: (1) whether Defendants consented to the TBI-MFCU office reviews, and (2) whether the regulatory exception to the warrant requirement is applicable in this case.

## 1.  Whether Defendants Consented to the TBI-MFCU Office Reviews

### a.  Defendants' Position

Defendants contend that they did not give effective consent to search in this case. In their briefs [Docs. 40 and 56], Defendants note that the government has principally relied upon

consent - that the Brocks consented to the searches and consented through their contracts with managed care contractors that administer TennCare - as the basis for the warrantless searches and seizures of evidence in this case. Defendants argue that any consent given by them when the TBI agents conducted office reviews of the Tazwell Medical Clinic ("TMC") on May 23, 2003 and April 21, 2004 was not voluntarily given and is therefore ineffective.

Defendants contend that on the date of each office review and upon entering TMC, the agents presented them with a letter that explained TBI's authority to demand access to records and to search the office. They note that the letter also warned that, pursuant to 18 U.S.C.A. § 1518, they could be subject to criminal sanctions for obstructing a criminal health care fraud investigation. Defendants further note that an administrative search warrant is required where a provider objects to the search at the time it is conducted. Defendants argue that because TBI agents presented letters explaining their authority to demand records and threatened the Brocks with administrative sanctions and criminal prosecution, they concluded that they were required to permit access and, thus, consent was not voluntary.

Finally, Defendants argue that even if the Court finds that such consent is a valid exception to the warrant requirement, the consent given by contracts with the managed care contractors (MCCs) that administer TennCare only grants access to *enrolles* of those plans. Defendants state that according to Agent Battle's declaration [Doc. 47], Agent Battle handed Ms. Brock a list of patient records that the TBI intended to scan and copy, but the declaration does not indicate whether the records requested were those of TennCare enrollees or not. Defendants contend that because the government has offered no evidence that the records seized were in fact records of TennCare enrollees, it has not met the burden of establishing that consent was given to access those

records and, thus, the records were seized in violation of the warrant requirement of the Fourth Amendment and must be suppressed.

In their Reply To The Government's Response To The Brocks' Post-Hearing Brief [Doc. 59], Defendants contend that the government, in its response [Doc. 58], has attempted to prove that records seized by TBI were within the scope of those contemplated in the pertinent contracts and statutes by introducing unsworn statements related to discovery provided in this case. Defendants argue that it does not mater what the government contends that the Brocks have learned through discovery because the record is void of any evidence that establishes that the records requested were records of TennCare enrollees or Medicaid recipients. Specifically, Defendants argue that Agent Battle's Declaration [Gov. Ex. A] only states that she requested records and that [Ex. A-2 and A-3] are simply the lists provided by agent Battle.

### b. Government's Position

Initially, the government states that Defendants' contracts [Gov. Ex. A-6, BlueCare Attachment, p.7; Ex. A-7, p.6] with TennCare Managed Care Contractors (MCCs) required them, as a precondition to participating in TennCare, to provide TBI-MFCU with records pertinent to their participation in the TennCare program and that Defendants agreed to these terms when they signed said contracts. The government further states that said contracts were in effect on each of the three office reviews when MFCU requested access to scan certain identified patient files. See Battle Declaration [Doc. 47].

The government further notes that, pursuant to 42 CFR § 431.107, every provider must agree to retain records of its activities and, in addition, all providers must agree to furnish any

and all of this information to the TBI-MFCU. Tennessee also demands that TennCare Managed Care Contractors ("MCCs"), including BlueCare, PHP and John Deere Health Plan, require their providers to preserve a wide range of medical and billing data for five years. Contractor Risk Agreement ("CRA") § 2-18(k). The contract requires that all TennCare providers allow the Medicaid Fraud Control Unit (MFCU)[2] access to their records and MFCU need not make their request for records in advance.[3] The government argues that the CRA specifically requires the provider to open its doors to MFCU as a condition of doing business with TennCare and, by its very terms, does not permit the MCC or the provider to "negate or supersede" its requirements by placing arbitrary limits on the time, place and manner of MFCU's access to records. CRA § 218. In other words, the provider must "cooperate" with MFCU. CRA § 2-18.

Second, the government notes that despite the clear language of the TennCare contracts into which the Brocks voluntarily entered [Gov. Ex. A-6, BlueCare Attachment, p.7; Ex. A-7, p.6], the Brocks contend that they did not give effective consent to the TBI to conduct the office reviews because they were given no choice but to "acquiesce to a claim of lawful authority

---

[2] The Medicaid Fraud Control Unit (MFCU) is located in the Tennessee Bureau of Investigation and is part of the State of Tennessee. MFCU is charged with investigating and preventing fraud in the TennCare system. See U.S.C.A. § 1396b(q), 42 CFR § 1007 and T.C.A. § 71-5-118.

[3] See CRA § 1-5 (Battle Declaration, Gov. Ex. A-8); CRA § 2-18. Pursuant to Executive Order 47, the TBI-MFCU is the state agency responsible for the investigation of provider fraud and abuse in the State Medicaid program (TennCare)...TennCare managed care organizations and health care providers shall, upon request, make available to the TBI MFCU any and all administrative, financial and medical records relating to the delivery of items or services for which TennCare monies are expended. In addition, the TBI MFCU must be allowed access to the place of business and to all TennCare records of any TennCare managed care organization or health care provider during normal business hours, except under special circumstances when after hours admissions shall be allowed.

in permitting...patient records to be seized." The government disagrees, contending that TBI-MFCU conducted each office review reasonably and professionally and within the scope of its authority.

Specifically, the government argues that on each of the three office reviews: (1) the reviews took place during Defendants' normal business hours, (2) the agents presented themselves at TMC, identified themselves and explained that they were there to scan certain identified patient files, (3) the agents were dressed in business attire and no firearms were present, and (4) MFCU requested only a limited number of patient records, scanned them and returned the records on the same day and in the same condition as they received them.

With regard to the May 23, 2003 office review, the government argues that: (1) Defendants questioned the agents' authority and consulted legal counsel before allowing the review to go forward, (2) the agents did not begin their review until after the arrival of the Brocks' attorney, Benjamin Presnell, (3) when Mr. Presnell arrived, the agents presented him with the letter from TennCare Deputy Director Reynolds [Ex. A-1] which sets out TBI's authority to review records relating to a TennCare/Medicaid investigation, (4) the letter [Ex. A-1] advises the provider that they can be excluded from the TennCare program for failing to supply information or granting access, (5) the letter [Ex. A-1] provides the names and telephone numbers of TennCare Officials who they could call for additional information, (6) neither Defendants nor their attorney chose to call this number, (7) upon Mr. Presnell's advice, Defendants consented to the office review and appointed one of TMC's employees to assist in retrieving records, and (8) Defendants did not revoke consent.

With regard to the April 23, 2003 office review, the government argues that (1) the

Brocks once again consulted legal counsel before allowing the review to go forward, and (2) as evidence that Defendants were fully informed of their rights and obligations, Ms. Brock informed the agents that she had been advised by her attorney that neither she nor her staff were obligated to speak with the agents and she instructed the agents not to talk with the TMC staff.

With regard to the July 1, 2003 office review, the government contends that the evidence shows that this visit was pre-arranged by Dr. Fejeran and the Brocks and that Mr. Brock did not even stay at TMC after the TBI arrived.

As to Defendants' claim that they were threatened with criminal sanctions if they refused access, the government argues that there is no evidence to support this contention. The government first notes that the Reynolds letter [Ex. A-1], which was presented at the May 23, 2003 office review, does not mention 18 U.S.C. § 1518 at all, and further notes that the June 2, 2003, Manny Martins letter [Ex. A-4] which was provided to Defendants at the April 21, 2004, office review merely recites the federal statutory penalty for willful obstruction of a criminal health care fraud investigation. The government contends that there is no evidence that Defendants revoked consent given when they entered into the TennCare contracts or that they were under any duress or coercion at the time they consented to the office reviews at issue.

Finally, the government contends that Defendants' claim that even if the Brocks had given valid consent to the office reviews, that consent extended to records of enrollees and the government offered no proof that the records inspected and scanned were TennCare enrollee records, is unsupportable. The government argues that (1) the TBI provided Defendants a list of patient files they wished to scan [Ex. A, A-2, A-3], and (2) Defendants provided those records without objecting that any of the requested records were outside the scope of the TBI's authority.

## c. Court's Analysis

The government argues that (1) Defendants' consent to the office reviews can be found in their contracts with the Manage Care Contractors (MCCs) which administer TennCare, (2) Defendants voluntarily consented to each of the three office reviews and were not under any duress or coercion at the time they consented to same, and (3) the records reviewed in this case were records pertinent to the treatment of TennCare beneficiaries and Defendants consented to the scanning of patient files on the lists provided by the TBI. While Defendants do not appear to contest the authenticity of their contracts with the TennCare MCCs, they do contend that any consent given by them when TBI agents conducted office reviews of the Tazewell Medical Clinic (TMC) was not voluntarily given and is, therefore, ineffective. Further, Defendants contend that the government has offered no evidence that the records seized were in fact records of TennCare enrollees.

Initially, the Court notes that at the suppression hearing, Defendants stipulated to the authenticity of certain contracts [Exs. A-5[4], A-6[5], A-7[6], A-9[7] and A-10[8]], which Defendants entered

---

[4] BlueCross BlueShield of Tennessee Health Care Professional Agreement between Blue Cross Shield of Tennessee/Blue Care and LaWanna Brock. Signed by Ms. Brock on April 7, 2001 [Gov. Ex. A-5, BlueCare Attachment, p. 13]

[5] PHP TennCare Health Care Professional Agreement with LaWanna Brock, FNP. Signed by Ms. Brock on June 20, 2002 [Gov. Ex. A-6, p. 24].

[6] TennCare Physician Provider Agreement between John Deere Health Plan, Inc. and Tazewell Medical Clinic. Signed by Ms. Brock on January 16, 2001 [Gov. Ex. A-7, p. 18].

[7] BlueCross BlueShield of Tennessee Health Care Professional Agreement between Blue Cross Shield of Tennessee/Blue Care and Rondal Brock. Signed by Mr. Brock on May, 15, 2002

into with specific TennCare Managed Care Contractors (MCCs). Specifically, Defendants agreed

that the contracts were signed by Defendants and stipulated that the contracts were in place at the

time of the office reviews at issue in this case. Each of the aforementioned contracts between the

MCCs and Defendants provides for inspection of medical records by TennCare, either announced

or unannounced. See [Ex. A-5, BlueCare Attachment, p.7, section L.2]; [Ex. A-6, p.18]; [Ex. A-7,

p.6]; [Ex. A-9, p.11, section 10.3]; and [Ex. A-10, p.18]. The Code of Federal Regulations also

states the following:

> A State plan [TennCare] must provide for an agreement between the
> Medicaid Agency (the MCCs) and each provider or organization
> furnishing services under the plan in which the provider or
> organization agrees to: (1) Keep any records necessary to disclose the
> extent of services the provider furnishes to recipients..

42 CFR § 431.107(b). And the provider must:

> On request, furnish to the...State Medicaid Fraud Control Unit[9]...any
> information maintained under paragraph (b)(1) of this section and any
> information regarding payments claimed by the provider for
> furnishing services under the plan...

42 CFR § 431.107(b)(2). Additionally, Valerie Smith, a staff attorney with the TBI, testified that

the Contractor Risk Agreement ("CRA") [Gov. Ex. A-8] is representative of the type of contract that

the State enters into with every MCC. She stated that Section 2-18 of the CRA [Gov. Ex. A-8] is

what TennCare requires MCCs to put in their contracts with providers. She explained that this

---

[Gov. Ex. A-9, p. 21].

[8] PHP TennCare Health Care Professional Agreement with Rondal Brock, PA-C. Signed
by Mr. Brock on June 20, 2002 [Gov. Ex. A-10, p. 24].

[9] The Tennessee Medicaid Fraud Control Unit is located in the Tennessee Bureau of
Investigation (MFCU) and is part of the State of Tennessee. MFCU is charged with
investigating and preventing fraud in the TennCare system. See 42 U.S.C.A. § 1396b(q), 42
CFR § 1007 and T.C.A. § 71-5-118.

section, entitled "Provider Agreements," provides that TennCare, U.S. Department of Health and Human Services, and Office of Inspector General Comptroller have the right to evaluate through inspection, whether announced or unannounced, or other means any records pertinent to the Agreement including quality, appropriateness and timeliness of services and such evaluation, and when performed, shall be performed with the cooperation of the provider. CRA § 2-18.m.

Based on the language set forth in the aforementioned contracts, coupled with Defendants' stipulation to the authenticity of said contracts, it would appear that Defendants, by virtue of the relationship entered into with Medicaid, automatically consented to an inspection of their Medicaid related records, thereby waiving any Fourth Amendment objection. Defendants disagree with this interpretation, however, noting that the Tennessee Attorney General issued an Opinion in 1989, which states that, "if...the provider objects to the search at the time it is to be conducted, the consent would be revoked, and the State would not be entitled to forcibly proceed with the search and seizure of the records." Tenn. Op. Atty. Gen. No. 89-96, p.4. Under these circumstances, an administrative search would be required. While Defendants do not claim to have verbally "objected to the searches" when the office reviews were conducted, they do argue that consent was not voluntary given. Thus, the Court will next address whether consent to search was voluntarily given for the office reviews at issue here.

The government first argues that each office review was conducted reasonably and professionally, as evidenced by the fact that: (1) the reviews took place during Defendants' normal business hours, (2) the agents presented themselves at TMC, identified themselves and explained that they were there to scan certain identified patient files, (3) the agents were dressed in business attire and no firearms were present, and (4) MFCU requested only a limited number of patient

records, scanned them and returned the records on the same day and in the same condition as they received them. Having reviewed the evidence before it, the Court would agree with the government's assessment as stated above. Based upon the testimony of Margaret Chuinard, Brian Prichard, and Barry Carrier, as well as the Declaration of Wahtawah T.J. Battle [Gov. Ex. A], the Court specifically finds the following:

**May 23, 2003 Office Review**: Special Agents Battle and Pritchard entered the front door of the Tazewell Medical Clinic ("TMC") at approximately 8:00 a.m., went to the front desk in the lobby, presented identification, and requested to speak with Dr. Fejeran. Agent Pritchard was wearing a jacket and a tie and carried a sidearm, which was not visible. SAs Battle and Pritchard were advised that Dr. Fejeran was not in the office and were escorted to a private room inside the clinic, where they spoke with the Brocks and informed them that the TBI was conducting an office review. They presented the Brocks with a copy of Executive Order 47 [Gov. Ex. A-1] and explained to them that they were there to copy some records. The Agents also informed the Brocks that they could remain open while the office review was conducted. The Brocks asked to contact their attorney, Benjamin Presnell. At 8:35 a.m., Mr. Pressnell arrived at TMC and met with SA Battle and SA Chuinard. SA Battle presented Mr. Pressnell with a copy of Executive Order 47 [Gov. Ex. A-1].

The TBI requested 15 patient records [Gov. Ex. A-2]. Ms. Brock instructed office manager, Melissa Robinson, to assist the TBI in retrieving the medical records. At approximately 10:00 a.m., SAs Chuinard and Pritchard, as well as a few other agents, set up scanning equipment and began scanning records in a private, employee break area. The agents, who participated in scanning records, entered TMC through a back door and did not walk through the patient care area. Agent Pritchard carried files from the storage cabinets to the area where they were being scanned, assisted in disassembling the files and reassembling the files, and returned the files to office staff.

At approximately 12:00 p.m., Ms. Brock announced that they were closing TMC and left Ms. Robinson to assist the TBI. The TBI office review concluded at approximately 2:05 p.m.

**July 1, 2003 Office Review**: Special Agents Battle and Carrier

23

entered the front door of the Tazewell Medical Clinic ("TMC"), presented identification to the receptionist, and asked to speak with the person in charge. SA Battle explained why they were there. SA Carrier and other agents used a back entrance at TMC to set up scanning equipment. Mr. Brock was present at TMC, but Ms. Brock was not. At some point during the office review, Mr. Brock left TMC.

**April 21, 2004 Office Review**: Special Agents Battle and Carrier entered the front door of the Tazewell Medical Clinic ("TMC") at approximately 9:00 a.m., presented identification to the receptionist, and asked to speak with the person in charge. Ms. Brock escorted the Agents into another room. SA Battle presented Ms. Brock with a list of medical records for copying [Gov. Ex. A-3]. Ms. Brock called her attorney, Benjamin Pressnell. Mr. Pressnell arrived at TMC at approximately 10:30 a.m. SA Battle presented Mr. Pressnell with a the list of requested records [Gov. Ex. A-3] and a letter from Deputy Commissioner for the Bureau of TennCare [Gov. Ex. A-4].

Ms. Brock informed the agents that she had spoken with her attorney and that she did not have to talk to them or answer any questions. The agent s agreed to those terms before scanning. She also asked the agents not to speak to her staff. The agents agreed not to speak to her or her staff. The agents began scanning documents after Ms. Brock spoke with Mr. Pressnell but before Mr. Pressnell arrived.

Ms. Brock assigned a member of the office staff, Glenda, to assist with retrieving the re vquested medical records. Mr. Brock retrieved additional records from storage and unloaded the boxes at the rear of the clinic. The agents, who were in charge of scanning records, used the back entrance of the clinic and utilized the TBI Mobile Unit to scan the records.

An officer may conduct a warrantless search when the person with a privacy interest in the item to be searched gives a free and voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219-22 (1973). Where the government alleges that consent was given voluntarily, however, "'the government bears the burden of proof on this issue' and 'the consent must be unequivocal and intelligently given, untainted by duress or coercion.'" United States v. Bueno, 21 F.3d 120, 126 (6th

Cir. 1994). Whether a defendant's consent was voluntary is a question of fact to be determined from the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544, 557 (1980); United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998). Relevant factors include the defendant's age, intelligence, and education; whether she understands her constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police. United States v. Valdez, 147 Fed.Appx. 591, 596 (6th Cir. 2005). The Fourth Amendment requires only that the police reasonably believe the search to be consensual. Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990)). Given Defendants' acquiescence and assistance in providing the requested files, after consulting with legal counsel, the evidence clearly establishes the reasonableness of the agents' belief that the searches were consensual.

Based on the record before it, the Court agrees with the government and finds that the Brocks' consent to search, with regard to each office review, was voluntary and, therefore, was not simply an "acquiesce to a claim of lawful authority." Specifically, the Court finds that as to the May 23, 2003 office review, the agents arrived at TMC, presented identification, and informed the Brocks that they were there to conduct an office review. The Agents provided the Brocks with a copy of Executive Order 47 [Gov. Ex. A-1], which sets out TBI's authority to review records relating to a TennCare/Medicaid investigation, and requested to scan fifteen patient records [Gov. Ex. A-2]. There is no evidence that the agents had their weapons drawn and there is no evidence that the agents threatened the Brocks in any capacity in order to effectuate a consent to the review. Instead, the record indicates that the agents were cordial and professional and when the Brocks asked to consult with their attorney before allowing the office review to proceed, the agents waited and did not begin the review until after the Brocks' attorney had arrived at TMC and had consulted

with them. It was only after the Brocks consented to the review and appointed office personnel to assist the agents with gathering records that the agents began to scan records. Further, contrary to the Brocks' contention that they were threatened with criminal sanctions if they refused access, there is no evidence in the record to support this accusation, nor does [Gov. Ex. A-1], which is a copy of the letter provided to the Brocks on May 23, 2003, mention 18 U.S.C. § 1518.

As to the July 1, 2003 office review, the Court finds that the agents again arrived at TMC, presented identification, and informed Mr. Brock that they were there to conduct an office review. According to the Declaration of Wahtawah T.J. Battle [Gov. Ex. A], the agents had arranged the July 1, 2003 office review with Dr. Fejeran and the Brocks prior to the review. While the testimony of Special Agent Carrier does not specifically corroborate SA Battle's Declaration, it does not contradict it either. In fact, the record indicates that on July 1, 2003, someone at TMC opened up the back door of the clinic for the TBI agents, so that the agents could bring in and set up scanning equipment to scan patient records. In other words, there is no evidence in the record before the Court which would suggest that the Brocks did not voluntarily consent to the July 1, 2003 office review.

As to the April 21, 2004 office review, the agents once again arrived at TMC, presented identification, and informed the Brocks that they were there to conduct an office review. The Agents provided the Brocks with a list of medical records for copying [Gov. Ex. A-3]. The Brocks consulted with their attorney, who informed them that they did not have to talk to and/or answer any questions the agents might have. The Brocks consented to the office review on the condition that the agents did not speak with them or members of their staff. The agents agreed and the Brock again assigned someone to assist the agents with locating/retrieving the requested records.

There is no evidence that the agents had their weapons drawn or that the agents threatened the Brocks in any capacity in order to effectuate a consent to the review. In other words, the Court finds that the Brocks were not under any duress or coercion at the time they consented to the office reviews at issue here.

Finally, to the extent that Defendants argue that the government has "not met the burden of establishing that consent was given to access [certain] records" on each office review of Tazewell Medical Clinic and/or that TBI inspected and scanned records other than TennCare/Medicaid enrollee records, there is no evidence to indicate same. Based on the record before it, the Court finds that the TBI provided Defendants with a list of patient files which they wished to scan with regard to the May 23, 2003 and April 21, 2004 office reviews [Gov. Ex. A-2 and A-3] and Defendants provided access to those records without objecting that any of the requested records were outside the scope of TBI's authority. Additionally, with regard to the July 1, 2003 office review, it appears that this office review was arranged by SA Battle, Dr. Fejeran and the Brocks in order for the TBI to obtain additional documentation from TMC. While there is no evidence to indicate that the government provided Defendants with a list of records to be obtained on this date, there is also no evidence to indicate that the Brocks either refused consent or objected to any files being inspected. In fact, the record indicates that Mr. Brock actually left TMC while the office review was being conducted in order to go hunting. Accordingly, the Court finds that Defendants' argument with regard to whether the Brocks consented to the inspection of certain records and/or whether those records were actually TennCare/Medicaid enrollee records is without merit.

## 2.  Whether the regulatory exception to the warrant requirement is applicable in this case

### a.  Defendants' Position

Defendants contend [Doc. 56] that there are insufficient limitations placed on the TBI-MFCU agents in obtaining medical records from providers through unannounced demands to constitute a regulatory inspection exception to the warrant requirement as set out in New York v. Burger, 482 U.S. 691 (1987).

Citing Burger, Defendants note that even if the owner of a closely regulated industry has a reduced expectation of privacy, and the warrant and probable-cause requirements for a government search are lessened in this context, the "warrantless inspection" will be deemed reasonable only so long as three criteria are met: (1) there must be a substantial government interest, (2) the warrentless inspections must be "necessary to further the regulatory scheme...", and (3) the statute's inspection program must provide a constitutionally adequate substitute for a warrant; in other words, it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

Defendants contend that the second and third prongs of Burger are not met here.  As to the second prong, Defendants argue that unannounced office reviews by armed agents demanding immediate access to records is not necessary to further the government's interest in preventing health care fraud. Defendants note that evidence presented at the hearing established that unannounced record requests are only one investigative tool employed by TBI, and that because other means are available, the method employed here was not *necessary* to furtherance of the

administrative scheme.                    As to the third prong of <u>Burger</u>, Defendants argue that the TBI-MFCU inspection program does not constitute a constitutionally adequate substitute for a search warrant because it does not have a properly defined scope and does not properly limit the discretion of the officials conducting the inspection.  Specifically, Defendants argue that: (1) while the contracts signed by Ms. Brock upon entering the TennCare program advised her that she would subject to some oversight,  they did not advise her that an investigation of the magnitude that occurred during the TBI office reviews could be undertaken, and (2) there is no evidence that any precautions were taken to ensure that TBI was only permitted access to enrollee records.  Citing the testimony of Valerie Smith, staff attorney at TBI, Defendants further argue that the TBI-MFCU inspection program appears to be purely discretionary whether agents choose to proceed by simply demanding records or by obtaining administrative subpoenas.

Finally, Defendants argue that even if the Court finds that the administrative or regulatory search exception to the warrant requirement applicable to highly regulated industries is applicable here, the statues and regulations relied upon by the government to justify this exception permit access  to records of patients that are recipients of services provided by Medicaid and/or TennCare.  Defendants contend that because the government has not offered any evidence that the seized records were those of Medicaid or TennCare enrollees, the exception to the warrant requirement authorized under <u>Burger</u> does not justify the seizure of the records taken from the Tazewell Medical Clinic and, thus, the government has failed to meet its burden of establishing that an exception to the warrant requirement applies to the seizure of those records.

**b. Government's Position**

The government responds [Docs. 47 and 58] that administrative or regulatory searches are another well recognized exception to the warrant requirement. United States v. Biswell, 406 U.S. 311 (1972). The rationale for this exception is that when a person engages in a "closely regulated" or "highly regulated" business, he does so with the knowledge that his business will be subject to effective inspection. Id. at 316. The government argues that the MFCU's reviews of Defendants' records fit squarely within the "closely regulated" exception to the warrant requirement of the Fourth Amendment because Tazwell Medical Clinic ("TMC") is engaged in a highly regulated business.

In support of its contention that MFCU has the right to request and receive provider documents, the government contends that: (1) both Tennessee law and federal law allow administrative searches of TennCare providers, (2) the government has a substantial interest in preventing health care fraud, (3) TennCare's regulatory scheme furthers the government's interest in preventing health care fraud, (4) the person subject to the regulatory scheme has reason to know that such inspections may take place pursuant to the law, and (5) the administrative or regulatory inspection, audit, review or search is limited in time, place and scope. [Doc. 47-1]. The government further contends that just because there may be other investigative tools, for example search warrants, does not in any way diminish the necessity of warrantless inspections to further the regulatory scheme. The government argues that there are clearly articulated limitations placed on regulatory inspections by TBI.

As to Defendants' assertion that the "government has offered no evidence that the records seized were in fact records of TennCare enrollees," the government argues [Doc. 60] that whether the records scanned were TennCare beneficiary files is not determinative of the lawfulness of the office reviews because (1) Defendants consented to the scanning of patient files on the lists

provided by the TBI and (2) Defendants agreed by entering into the provider agreements to an inspection of any records pertinent to the treatment of TennCare beneficiaries and the billing of TennCare for services provided by TMC. The government further contends that, to the extent Defendants claim that certain records were scanned without their consent, it is Defendants' burden to prove that challenged items were outside the scope of their consent.

### c. Court's Analysis

Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search have lessened application in this context. New York v. Burger, 482 U.S. 691, 702 (1987). Where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment, so long as three criteria are met: (1) there must be a "substantial" government interest in regulating the industry, (2) the warrentless inspections must be "necessary to further the regulatory scheme...", and (3) the statute's inspection program must provide a constitutionally adequate substitute for a warrant. Id. In other words, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Id. Additionally, in defining how a statute limits the discretion of the inspectors, the Court has observed that it must be "carefully limited in time, place, and scope." Id.

Initially, the Court notes that Defendants do not contest the fact that the federal government and the state of Tennessee have a substantial interest in preventing health care fraud.

Thus, the Court will not endeavor to analyze whether health care/Medicaid Program [TennCare] constitutes a "closely regulated" industry since it does not appear to be an issue raised by Defendants.

As to the second criteria - whether the warrantless inspection of health care/Medicaid Program is necessary to further the regulatory scheme - the Court finds that this criteria is satisfied here. As previously noted, federal law requires (1) TennCare providers to agree to keep any records necessary to disclose the extent of the services the provider furnishes to recipients, and (2) to furnish, upon request, to the State Medicaid Fraud Control Unit [TBI-MFCU] any information with regard to services the provider furnishes to recipients and any information regarding payments claimed by the provider for furnishing services under the plan. See 42 CFR § 431.107(b)(1)-(2). Additionally, all TennCare Managed Care Companies (MCCs) require providers to enter into a contract, called a Contractor Risk Agreement (CRA), whereby the provider agrees to preserve medical and billing data for five years and to allow MFCU access to the records upon request, whether announced or unannounced. As the government notes, by requiring providers to preserve records, the TennCare statutes and regulations establish a means by which a provider's services and billing can be measured and evaluated. However, evaluations cannot take place unless there is also reasonable access to those records. Therefore, without the ability to conduct inspections, the vast majority of health care fraud would go undetected. As the Eighth Circuit recognized, "[t]he government has a substantial interest in establishing methods by which it can effectively monitor compliance with the regulations governing the Medicaid Program and root out opportunities for instances of fraud." United States v. Brown, 763 F.2d 984, 987-88 (8th Cir. 1985).

As to the third criteria - whether the statute's inspection program provides a constitutionally adequate substitute for a warrant - the Court likewise finds that this criteria is

satisfied here.  As noted above, the requirements upon TennCare providers are clear.  All providers must maintain adequate records and make those records available upon MFCU's request.  Additionally, the contracts between the MCCs and Defendants provide for inspection of medical records by TennCare, either announced or unannounced.  See [Ex. A-5, BlueCare Attachment, p.7, section L.2]; [Ex. A-6, p.18]; [Ex. A-7, p.6]; [Ex. A-9, p.11, section 10.3]; and [Ex. A-10, p.18].  Thus, the Court finds that Defendants had reason to know that they were subject to this regulatory scheme and that such inspections could take place pursuant to the law.

Finally, the Court also finds that the office reviews in this case were limited in time, place and scope.  As the Court has already found, at each office review, the TBI agents arrived at the Tazewell Medical Clinic, presented identification, and informed the Brocks that they were there to conduct an office review.  The record indicates that the office reviews were conducted during normal business hours.  The reviews began at approximately 9:00 a..m. and ended at 2:00 p.m. and 5:00 p.m. respectively.  The agents were dressed in streets clothes and most agents (who were responsible for scanning records) entered the clinic through a back entrance, so as not to disturb patient care there.  TBI-MFCU case agent, SA Battle, furnished Defendants and Defendants' counsel with a copy of MFCU's authority to request and receive medical files [Gov. Ex A-1 and A-4] and also provided them with a list of medical records for copying [Gov. Ex. A-2 and A-3].  Further, the Court has already found that Defendants voluntarily consented to the office reviews and assigned members of staff to assist the agents in retrieving records to be scanned.  Based on the record before it, there is no evidence that Defendants ever withdrew consent or objected to the scanning of any records.  Accordingly, the Court finds that the statute's inspection program provides a constitutionally adequate substitute for a warrant.

With regard to Defendants' contention that the government has not offered any

evidence that the seized records were those of Medicaid or TennCare enrollees and, thus, has failed

to meet its burden of establishing that an exception to the warrant requirement applies to the seizure

of those records, the Court finds no merit in this argument.  The Court notes that it has already

addressed this matter above by finding that all three criteria of <u>Burger</u> were met in this case and,

thus, a warrantless inspection of the Tazewell Medical Clinic was reasonable within the meaning

of the Fourth Amendment.  More specifically, the Court has found that the office reviews at issue

here were limited in "time, place, and scope" as required by the third criteria of <u>Burger</u>.


## V.  CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that

Defendants' LaWanna Brock and Rondal Brock suppression motion [**Doc. 40** ] be **DENIED**.[10]


Respectfully submitted,


<u>s/ C. Clifford Shirley, Jr.</u>
United States Magistrate Judge


---

[10]Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  The District Court need not provide <u>de novo</u> review where objections to this report and recommendation are frivolous, conclusive, or general. <u>Mira v. Marshall</u>, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review. <u>Smith v. Detroit Federation of Teachers</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).